UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        CRIM. CASE NO. 13-20495

    Plaintiff,

v.        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

D-1 ANDRE HURSTON
D-2 WILNEITA SMITH

    Defendant.
_____/

**ORDER
DENYING DEFENDANTS' MOTIONS TO SUPPRESS
(1) EVIDENCE SEIZED AT CAR STOP
(2) ORAL STATEMENTS AT TIME OF STOP
(3) ORAL STATEMENTS AT POLICE STATION THAT NIGHT**

I.    BACKGROUND

This case arises from an armed robbery of a delivery van at the Patient Care Pharmacy, 15301 Tireman, Dearborn, MI on May 2, 2013.  Responding Dearborn Police Officers learned that at 10:25 a.m., two black males driving a blue Dodge Charger hijacked a van that was delivering a large quantity of controlled substances, and that one of the robbers displayed a firearm and wore a ski mask to cover-up his face.

The officers subsequently learned that a GPS tracking unit was contained in a box of drugs inside the van. The GPS monitoring company, Freight Watch, provided immediate updates to the police on the location of the GPS unit which ended up at either 15623, 15629, or 15635

1

Log Cabin Street residences in Detroit, and further informed them that the GPS unit had become stationary at that location at 11 a.m..

Officers set up team surveillance.  Two officers observed a blue Dodge Charger parked directly behind the 15629 Log Cabin residence address, with its trunk facing the rear door.  That description matched the car used in the robbery.  At this point, 11 a.m., the surveillance was directed at the 15629 Log Cabin address.

At 11:30 a.m., an officer saw a black Chevrolet Suburban (SUV) pull up to and park at the 15629 residence, and two individuals, later identified as co-defendants Andre Hurston and Wilneita Smith, exit the SUV, knock on the front door of the 15629 residence, and then enter.  Neither co-defendant carried anything, other than Smith carrying a purse, and Hurston using crutches.

About an hour later, the agent saw the two defendants exit the residence accompanied by two black males (the robbery was committed by two black males): Smith was carrying two light-colored grocery bags, and the two black males were each carrying a weighted-down dark grocery bag. An officer saw Defendant Smith place her two bags inside the SUV and enter the front passenger side.  The two black males then gave Smith, who was inside the SUV, the dark bags they were carrying, and the two males then returned to the residence.  With Defendant Hurston driving, the Defendants left the area followed by unmarked police vehicles.

Officers followed the SUV and subsequently ordered the Detroit Police to conduct a traffic stop, which took place just off Jefferson Avenue at the entrance to the Harbortown Apartments.  Prior to conducting the stop, the Detroit Police had seen Hurston commit a traffic violation by failing to signal before making a left turn.

The "stopping" Detroit Police officers testified they approached the SUV to identify and speak with the occupants – no guns drawn. Defendants contend that some guns were drawn at this time. In approaching the SUV and speaking with Defendant Hurston, Corporals Graser and McNamara saw, through the opened back driver's-side rear window, on the back seat behind the front passenger seat, two dark "blousy" plastic bags, that were open enough to see the contents – pillboxes and pharmacy-style pill bottles.

At the stop scene, an officer spoke to co-defendant Smith, who then informed him that she had a firearm in her purse and a Concealed Pistol License (CPL) permit.  In retrieving the firearm to guarantee officer safety, Col. Graser observed some boxed pharmaceuticals and a cell phone in her purse.  The cell phone was subsequently examined pursuant to a search warrant.

An officer seized two dark plastic bags from the SUV back seat that were found to contain several boxes of controlled substances.  Neither defendant was handcuffed or arrested at the car stop until after the police seized the black bags on the rear seat and checked with the officer in charge who ordered them to arrest the defendants.  After arresting the two Defendants, officers drove them to the Dearborn Police Station.  Both Defendants were provided their *Miranda* warnings at the station, and both made statements.

DISCUSSION

Did the officers have a legal basis to stop the SUV and engage the driver?  The Court concludes that they did have for multiple independent reasons.

The Court finds credible the testimony of Detroit Police Officer Christopher Nieman, who conducted the stop of Defendant's SUV, that he saw Defendant Hurston commit a traffic violation by not signaling before making a left turn. Transcript of Motion to Suppress, January

3

14, 2014, Nieman, P.133. While Nieman also testified that he had previously been requested by a Task Force Officer to stop the SUV, since Officer Nieman had probable cause to believe that a traffic violation had occurred in his presence, the stop was proper under the Supreme Court decision in *Whren v. United States*, 517 U.S. 806 (1996). In *Whren*, the Supreme Court noted that a public officer's motive in making the stop does not invalidate the officer's objectively reasonable behavior under the Fourth Amendment. Thus, while Officer Nieman may have been following orders to conduct a stop, at the time of the stop he had witnessed a traffic violation justifying the stop. Here, the circumstances of Defendant Hurston's failing to signal, viewed objectively, justified the stop.

Second, and independently, the Court concludes that even apart from the traffic violation given the fact scenario – armed robbery by suspects in a Blue Dodge Charger, GPS tracking to the Log Cabin address, with a Blue Doge Charger at the rear door, two Defendants going in empty, coming out with filled bags, and two black males helping them carry the bags – the officers certainly had reasonable suspicion to stop the mobile SUV to allay or confirm that it contained the fruits of the armed robbery. And upon seeing the pills in the back seat, there was probable cause to arrest the defendants.

Third, building on the second conclusion *supra*, the facts possessed by the full Task Force officers, provided the stopping officers with probable cause to stop and search the mobile vehicle, and then seeing the pill bottles in plain view, arrest the Defendants. There is an exception to the search warrant requirement as applied to vehicles due to their mobility, where the police have probable cause to believe that a crime was committed and this vehicle was utilized in committing a crime. *Carroll v. United States*, 267 U.S. 132 (1925); *California v.*

*Carney*, 471 U.S. 386 (1985); *Maryland v. Dyson*, 527 U.S. 465 (1999).  Here, the officer possessed facts supporting probable cause to believe that the SUV contained evidence of the crime of possessing and distributing stolen controlled substances, and that the Defendants were directly involved with that distribution.

Given the timing of the Defendants' recent post-robbery arrival at the GPS-located residence, the defendants' short stay, and their exit with multiple bags which appeared to contain packages such as those containing pills, there was probable cause to stop the car, and thereafter search the car and its occupants, even before the officers confirmed the presence of pharmaceuticals through the open-window view at the Harbortown location.  Given the large amount of controlled substances stolen at 10:30 a.m., there was a significant likelihood that the controlled substances would be illegally distributed.  And sure enough, the facts established the likelihood of distribution less than an hour after the robbery.  It is reasonable to infer that the two male robbers arrived at the Log Cabin address in the blue Dodge Charger, backed-up to the rear door, and shortly thereafter the Defendants arrived empty-handed and the distribution began, with not only the co-Defendants leaving the GPS-directed address in possession of multiple grocery bags, but also with the help of two black males (as described in the robbery report – 2 black males in a blue Dodge Charger).

The Court finds admissible Defendant Hurston's *Mirandized* statement that he paid over $1000 for the controlled substances, and that he intended that they would be distributed to others. The Court finds credible the testimony of the officers that the windows were down on this warm – but not hot – day, and that upon speaking with Hurston at the stop, the officers could see pill bottles in the "bloused out" plastic bags on the back seat.

The Court does not find credible Defendant Hurston's testimony, much of which was inherently incredible. After testifying that he purchased controlled substances at the residence that he and co-defendant Smith had entered less than an hour after the armed robbery, his response to a question of how long he stayed in the residence was "I don't recall," TR. P.179. When asked to "ballpark" the time, he testified "I just have no idea." *Id.* Finally, after the questioning AUSA "drilled down," Hurston acknowledged that it was "more than ten minutes," but "I don't know" if it was more or less than half an hour, but it was less than an hour. *Id.*

Thereafter, with regards to co-Defendant Smith's exit from the Log Cabin residence, Hurston testified: "I didn't see her carry no bags," the two black males did: "Tyson, and I forget the other guy's name." TR. P.180. Hurston further testified that the bags with the drugs were not handed to Smith inside the vehicle, rather, were put inside the car by the two males. TR. P.181. Smith testified that she did, indeed, hold a bag as one of the males assisted Hurston down the stairs at the porch (Smith P.190), that she gave him the bag back and the male subsequently put the bags on the back floor of the SUV. TR. P. 190.

Hurston's further untrustworthy testimony was that he didn't "remember who I got them [the drugs] from. I just gave the money to somebody" – some unknown person. Tr. P. 182, "I don't recall" how much money he paid for the controlled substances: "I said I don't recall". TR. P.182. In response to further AUSA questioning, he testified that it was less than $2000. The Court finds it unbelievable that Hurston would give a large sum of money to an unknown person to buy drugs.

Finally, as frosting on the cake of mendacity, the Court notes Hurston's response to the AUSA's question about whether the purpose of proceeding to the Log Cabin residence was to

6

buy drugs:

> Hurston: I got a call saying that he had something for me. I didn't know at the time what I was going for.
>
> AUSA: So for all you were aware, it was a flat screen TV? TR. P.184.
>
> Hurston: It could have been.
>
> AUSA: Really?
>
> Hurston: Yes.
>
> AUSA: So you had no idea that you were going to the Log Cabin address to purchase drugs?
>
> Hurston: No.
>
> AUSA: Yet you brought enough money to purchase the drugs?
>
> Hurston: Already had the money.
>
> AUSA: Right. You had the money to buy the drugs?
>
> Hurston: I had the money in my pocket already.

*Id.*

Given the evidence, the Court concludes that the agents had probable cause (or reasonable suspicion) to stop the SUV for a traffic violation. Under either reasoning, upon seeing the pill bottles through the open windows, they had probable cause to search the vehicle and its occupants with regard to the pharmacy robbery. *See California v. Acevedo*, 500 U.S. 565 (1991).

This conclusion of drug distribution to Defendants for further distribution is not a "stretch;" it is the logical conclusion reached from the facts in the possession of the law enforcement officers.

As to co-Defendant Wilneitha Smith, the Court does not find credible her testimony that the bags with drugs were on the floor of the SUV.

As to Smith's Motion to Suppress her statements made at Harbortown SUV traffic stop, the Court concludes that this questioning on the street in a public place, with no arrest, no handcuffs, no coercion – does not amount to custodial interrogation. *Berkemer v. McCarthy*, 468 U.S. 420, 436-37 (1984). Indeed, here she testified the Officer told her she was not under arrest. Smith, TR. P.194. This speaking with Smith occurred before the supervisor called to order the officers on the scene to arrest Hurston and Smith, at which point they were handcuffed and driven to the Dearborn Police Station.

For purposes of this Motion, the Court concludes that at the initial stop some officers had their guns unholstered, one or two may have had them pointed at the SUV. TR. Pp.198-99. However, there is no dispute that after the initial stop, all the guns were holstered and the Defendants were outside – Smith standing on the grass, and Hurston seated on the tailgate.

The Court credits the undisputed testimony that both defendants were ordered out of the SUV after the stop and the visual discovery of the drugs on the back seat, that they were not immediately handcuffed, physically restrained, or placed in a police car when spoken to/questioned at the scene, and that this "outside" scenario lasted 15-20 minutes. Smith PP. 203-204. During that time, they had brief conversations with the police officers who said "we need your help;" the police were not "in their face." Smith TR. P.204.

Smith further testified that at the police station at 8 pm, seven hours after arriving a the police station, she signed a Miranda waiver. TR. P.206.

Officer Gracer testified that he had contact with Ms. Smith after she was arrested, that she had a purse, and that she stated that she had a concealed pistol license (CPL) and that she had a firearm in her purse and more than three pill bottles of nitroglycerine. Gracer, TR. P.71. Officer Gracer testified that, by law, an individual with a CPL is required to advise police, on initial contact, that she has a gun: plaintiff did not so advise. Gracer, TR p.71. He testified that he went into the purse to secure the pistol and saw the drugs in the purse.

As to whether or not the officers' pistols were holstered or out at the initial stop, the Court finds that this is not a critical fact. All parties agree that after the initial stop, the guns were holstered, and the Defendants were not immediately handcuffed, or placed in the rear of a patrol car when they made on-the-scene statements.

As to the statement by Defendant Hurston at the stop, Dearborn Police Officer Michael McNamera testified, that he provided Hurston with oral *Miranda* warnings at the stop, and that he appeared to understand them, and agreed to waive them and speak. TR.P.92. That Hurston stated, in response to McNamera's question of where the pills came from, that he had "just purchased the pills from two males who he knew as Nuke and Tyson for $2,700." TR.P.92. At this point, McNamera stated Defendant Hurston did not answer any further questions. TR.P.92.

Whether the officers described it as an investigatory stop or a felony stop is not the crucial issue: the issue is how did the officers conduct themselves in the stop, and thereafter. The Court concludes that post-stop, pre-arrest, Defendants were not in custody so as to require *Miranda* warnings.

Defendant Smith testified that she was not provided *Miranda* rights at the stop. (Smith TR P.195). Since there was no statement made by Ms. Smith at the scene there is no legal issue

9

as to that period of time.

Ms. Smith, acknowledged receiving her *Miranda* warnings that might make any incriminating statement at the Dearborn Police Station. TR P.205.

As to Defendant Smith, the Court concludes that the officers could examine her purse in which she told them she had a pistol for their safety. In the purse, officers also discovered and seized pill bottles and a cell phone which was subsequently searched pursuant to a warrant.

It is clear that the Defendants went to the Log Cabin address, not to visit friends, but to purchase something. That address was not a store, it was not a Tupperware Party, and what they brought out in plastic bags fit the form of pill boxes or bottles. It is reasonable to assume that the stolen pill bottles would likely be within the grocery bags.

Smith's verbal statements made that night at the police station, after receiving *Miranda* warnings, are admissible. The Government has conceded that it will not use Smith's non-*Mirandized* on-scene statements in its case in chief. Doc. #78: Government Post-Hearing Brief, Feb. 24, 2014. P.17, n.4.

There was a seven hour gap between the on-the-scene questioning of Smith, and her *Mirandized* statement at the Dearborn Police Station. Smith testified that at the scene, police told her she was initially not under arrest. Smith TR. P.194. Apart from being handcuffed on the ride from the stop to the station, after the police discovered the pills and then arrested her, Smith was not cuffed inside the station. Smith testified that she voluntarily made her statement at the police station. TR. P.209.

In *Oregon v. Elstad*, 470 U.S. 298, 318 (1985), the Supreme Court held that the initial failure of police to administer *Miranda* warnings, does not *per se* taint subsequent statements

made after a defendant ha been advised of, and waive, her *Miranda* rights. In examining the totality of the circumstances here, the Court concludes that there was no coercion at the scene, much less at the station, that *Miranda* warnings were given, and that Defendant Smith's statement is admissible. Any taint was throughly purged through the 7 hour time period, and the change to a different venue, the administering of warning by a different officer, the signed waiver of *Miranda* rights and her testimony acknowledging that she received her *Miranda* warnings and signed waiver form.

Finally, the Court notes that the on-the-scene officers were entitled to rely on the information obtained by other officers: the "fellow officer" or "collective knowledge rule." *United States v. Lyons*, 687 F.3d 754, 767 (6th Cir. 2012), cited with approval in *United States v. Carter* __WL__ (6th Cir. 2014), #13-3043, March 12, 2014. *See also Whitely v. Warden*, 401 U.S. 560 (1971). *Carter* also stated that arresting "officers could reasonable rely on the well-known fact that drug-trafficking often involves the use of weapons, creating the necessary nexus between drug transactions and weapon searches." In the instant case, there was a drug transaction and a weapon was found in Defendant Smith's purse.

For the aforesaid reasons the Court DENIES Defendants' Hurston and Smith Motions to Suppress.

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 24, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 24, 2014.

                                        s/Deborah Tofil
                                        Case Manager